## 2956. GLAWSON *et al. v.* SOUTHERN BELL TELEPHONE & TELEGRAPH CO.

1. A public telephone company is a public-service corporation. It is under the duty of using ordinary care and diligence to afford the usual means of intercommunication to its subscribers, and to this end is under the duty of using ordinary care and diligence to keep its instrumentalities in working order; and the operators at the exchanges must use a like degree of care in answering calls and affording the necessary connection of subscribers' lines. A breach of this duty is a tort, and may give a cause of action. Only reasonable diligence is required; and in determining whether this degree of diligence has been exercised, the nature of the service, the delicacy of the instruments, and all other similar matters should be taken into consideration.

2. An action to recover damages on account of a negligent homicide under the Civil Code (1910), § 4424, is not an action seeking to recover for mental pain and suffering within the purview of the decisions holding that no recovery can be had in cases based on simple negligence, where no damage other than mental pain and suffering is shown.

3. In an action against a telephone company, wherein the petition asserted that the plaintiff's wife was threatened with an acute bodily disorder; that he arranged with a physician, ready, willing, and able to come at once to her relief upon notification by telephone, if certain dangerous symptoms appeared; that the symptoms appeared, and he endeavored to communicate with the physician by telephone, but, through negligence of the agents of the telephone company, was unable thus to summon the physician, and was unable to get in communication with him for several hours; that in the meantime the threatened disorder came upon his wife, and, before the physician could reach her after he received the belated summons, proved fatal, through her bleeding to death; that the disorder was one which was readily relievable by appliances which were in the hands of the physician, and, if the physician had received the call promptly, he could have prevented the disorder from coming on, or, if it had come on, could, by means of the appliances at hand, have prevented any serious results; and that the sole cause of his wife's death was the fact that she bled to death through inability to get the necessary medical or surgical attention, the court erred in dismissing the petition on the grounds that it did not appear that the death of the wife was a legal and natural result of the defendant's negligence, and that damages for the homicide were too remote and speculative in their nature to be legally attributable to the wrong charged.

4. In an action by a husband for damages on account of the negligent homicide of his wife, the measure of damages is prescribed by the code as being the "full value of the life of the deceased," and no additional damages are recoverable for mental anguish occasioned by the bereavement.

Decided June 7, 1911.

Action for damages; from city court of Americus—Judge Crisp. September 23, 1910.

*R. L. Berner, J. A. Hixon,* for plaintiffs.

*H. E. W. Palmer, B. J. Clay, W. P. Wallis,* contra.

POWELL, J. Glawson, on behalf of himself and minor children, filed a petition seeking to recover damages from the Southern Bell Telephone & Telegraph Company on account of the death of his wife, alleged to have been occasioned through the defendant's negligence. The trial court sustained a demurrer to the petition, and the case comes to this court on exception to this ruling.

The petition alleges, in substance, that the defendant is a telephone company engaged in the public service of operating telephone exchanges and long-distance telephone lines, and that it holds itself out as ready and willing to serve the public in this capacity; that Glawson and his family were subscribers to the defendant's exchange at Americus, and that one Dr. Prather, their family physician, was a subscriber to the same exchange; that Dr. Prather lived in Americus, and the plaintiff lived about seven miles away in the country; that on the 3d day of October, 1909, Mrs. Glawson, who was then about seven months advanced in pregnancy, was threatened with a miscarriage and Dr. Prather examined her condition and returned to the city, but agreed to remain at his residence, ready to answer any telephone call, and to come at once to Mrs. Glawson if his services were needed, and he so remained in readiness to come upon telephone communication. About 3 o'clock in the morning Mr. Glawson called up Dr. Prather and had a short talk with him about his wife's condition, but at the moment of that conversation it was not deemed necessary that the physician should come; but, immediately after this conversation was discontinued, Glawson found that more serious symptoms had set in, and went back to the telephone for the purpose of calling the physician to come at once. He was unable to get the operator in the central office at Americus to answer his call or to give him communication with the physician. He kept up his efforts to get into communication, and, after a period of 2 hours and 20 minutes, succeeded, and the physician came at once in his automobile, arriving within 20 minutes after the call reached him. In the meantime Mrs. Glawson's condition grew precarious, and neighbors who sometimes acted in the capacity of

midwives were called in; also a negro was dispatched on a mule with a message for the physician to come at once. About an hour after Mr. Glawson began his attempt to summon the physician, the miscarriage ensued, and a post-partum hemorrhage set in, from which Mrs. Glawson bled to death; she having lived only about 20 minutes after the physician arrived. It is alleged that the failure of the telephone company's agent to answer the call was both wilful and negligent; both simple and gross negligence being charged. It was alleged that there was in the central office a gong, which could be sounded at night by the ringing of the subscribers, so as to wake the operator if he were asleep, and that this gong had either been disconnected or was wilfully disregarded in the present case, though the petition seems to be somewhat ambiguous in this respect, since it also seems to be alleged that the operator was awake at the time and had just answered a previous call from Mr. Glawson to the physician. It is alleged that the highway from Americus to the Glawson home was in excellent condition, and that Dr. Prather had an automobile in which he could have made the trip in 20 minutes, and in which he did make the trip in that time when the message finally reached him. It is alleged that, if the message had reached the physician within a reasonable time after Mr. Glawson first attempted to get communication with him, the miscarriage of the wife could probably have been prevented, and, even if this could not have been prevented, the post-partum hemorrhage could have been stopped, and her death would not have resulted therefrom. It is also alleged that "in the checking of the post-partum hemorrhages there is nothing specially uncertain or problematic, but that the same can with certainty be done and performed by skilful physicians, and that said physician [Dr. Prather] had done and performed the same for his [Mr. Glawson's] wife various times before, had successfully attended her in the birth of five of her children, . . and could have and would have checked and stopped said post-partum hemorrhage and saved the life of petitioner's wife, but for said delay." It is further alleged that Mrs. Glawson was not afflicted with any other malady or trouble that would have caused her death, and that her death resulted solely from her lack of medical attention, and the failure to get the physician to stop the post-partum hemorrhage "that drained her life blood away on said occasion," which would

not have resulted if the physician had reached her in time. There is some amplification of all these allegations, but the foregoing fairly states the substance of the petition.

1. Two of the points involved in this case have recently been decided by this court. In *Southern Bell Tel. & Tel. Co.* v. *Beach*, 8 *Ga. App.* 720 (70 S. E. 137), it is held that "a corporation holding itself out as furnishing telephone service to the people of a community is a public-service company, and is charged with the duty of furnishing, for a reasonable compensation, to any inhabitant of the locality served by it, the usual telephone service for legitimate purposes," and also that it is bound to exercise this function with ordinary care and diligence. Telephone companies in respect to this duty stand very much on the same footing with telegraph companies, though the ·particular modus operandi of transmitting the message is somewhat different. Telephone companies are under the duty of furnishing to their subscribers reasonably prompt and efficient service in the way of giving them connection with other subscribers. Of course, in considering the actual quantum of diligence required, the delicacy of the instrumentalities involved and the difficulty of keeping them in repair and in perfect working order must be considered; and it may be said that a telephone company is held to only ordinary diligence in keeping its plants, instruments, etc., in working order for the purpose of facilitating conversations between its subscribers. As a part of the duties resting upon them, they should employ at the central office an adequacy of competent operators for such reasonable office hours as may be established, and, if night service is afforded, they are bound to use ordinary diligence in respect to the signals employed to give notice to the operator that some one is calling, and the operator must use ordinary diligence in answering the signal. Now in the present case it is alleged that the plaintiff and his family were subscribers to the defendant's exchange at Americus, and that he gave the ordinary signal, that the line was in order, and that by the negligence of the operator the signal was not answered, and as a consequence of this negligence communication was not established with the physician, who was also a subscriber. We have no hesitancy in holding that this sets up such a breach of public and private duty as constitutes a tort, and, if legal damage be shown, gives a cause of action.

2. The other proposition to which we referred as having been decided by this court was involved in the case of *Western Union Tel. Co.* v. *Ford*, 8 *Ga. App.* 514 (70 S. E. 65). In that case it was held that "while damages for mental and physical suffering alone, disconnected from any physical injury or pecuniary loss, can not be recovered from a telegraph company for negligence in failing to transmit and deliver a telegraphic message with due diligence, yet the company is liable for any physical or bodily injury, or pecuniary loss, directly traceable to its negligent conduct as the proximate result thereof." In the case just cited, the case of *Chapman* v. *Telegraph Co.*, 88 *Ga.* 763 (15 S. E. 901, 17 L. R. A. 430, 30 Am. St. Rep. 183), and a line of cases which has been based thereon (especially the case of *Seifert* v. *Telegraph Co.*, 129 *Ga.* 181 (58 S. E. 699, 11 L. R. A. (N. S.) 1149, 121 Am. St. Rep. 210), in which it was held that there can be no recovery on account of mere negligence where no loss other than pain and suffering ensued), were distinguished. The *Ford* case, just referred to, is very much in point, because in that case the injury complained of was the loss of an eye which might have been saved if the telegraph company had not failed to deliver a message addressed to the physician, who, if. the message had been promptly delivered, could have saved the eye.

We do not construe the present action as being a suit brought for pain and suffering alone. While mental anguish on the part of the husband and of the children who were bereft of wife and mother is set up, still, as will be seen later, these elements are to be eliminated. The action is based upon section 4424 of the Civil Code (1910), which provides: "The husband may recover for the homicide of his wife, and, if she leaves child or children surviving, said husband and children shall sue jointly, and not separately, with the right to recover the full value of the life of the deceased, as shown by the evidence, and with the right of survivorship as to said suit if either die pending the action." The next succeeding section of the code provides that the word "homicide," as used in that context, includes "all cases where the death of a human being results from a crime or from criminal or other negligence." This section, as well as the section referred to above, provides that the measure of damages shall be the "full value of the life of the deceased, as shown by the evidence." The damages

contemplated by these sections are not damages for pain and suffering, but are such as are intended to compensate for the loss of the monetary value which is assumed to exist in every human life, and which is somewhat measured by the decedent's earning capacity. In the light of the number of cases in which such recoveries have been allowed, it is hardly to be questioned that an action under these sections of the code can be brought for simple negligence, and that in such cases the rule in *Chapman* v. *Telegraph Co.*, supra, and in *Seifert* v. *Telegraph Co.*, supra, is not applicable.

3. The only troublesome question in the case is whether Mrs. Glawson's death can be regarded as the legal and natural result of the defendant's tortious acts, or whether they are too remote or speculative in their character. While there is some insistence on the part of the defendant in error that the action sounds in contract, and that the rule of damages applicable to that class of cases (that only such damages as were in contemplation of the parties can be recovered) should be applied, still there can be no reasonable doubt that the petition sounds in tort, and that the rules of damages applicable to tort cases are to be applied. On this subject our code provides (Civil Code (1910), § 4509): "If the damages are only the imaginary or possible result of the tortious act, or other and contingent circumstances preponderate largely in causing the injurious effect, such damages are too remote to be the basis of recovery against the wrong-doer." Also section 4510 provides: "Damages which are the legal and natural result of the act done, though contingent to some extent, are not too remote to be recovered. But damages traceable to the act, but not its legal or natural consequence, are too remote and contingent." (In the code as published—i. e., in all editions of the code the word "material" has, by typographical error, been substituted for the word "natural.")

We are aware of the fact that the courts are in wide disagreement as to whether damages which result through the failure to get a physician, so that the progress of a malady can be checked or the effects of a wound can be allayed, and injurious results prevented, are speculative and remote within the meaning of the rules just quoted. Some courts go almost to the extent of holding that it is impossible from a human standpoint to say what would be the result of a physician's services in checking almost any known disease

or of relieving almost any imaginable physical hurt or injury. But to our minds this difficulty which many courts assume to exist as to this question is largely factitious. To attempt to anticipate the result of almost any human act is always more or less problematical, but the fact that a thing may be problematical does not always prevent its being capable of reasonably accurate solution through the ordinary functions of the human intellect. There are some diseases and human ills which so readily respond to the treatment of a physician, according to the general experience of mankind, as to make it merely an ordinary inference, such as we are daily accustomed to indulge and to act upon, to say that if the treatment were applied the malady would be relieved. On the other hand, there are many diseases the results of which are so uncertain, even when the best treatment is had, as to make the chances of recovery always a matter of doubt. Whether any particular disease or any particular ill stands within the category of the reasonably certain or of the doubtful is a question that must be determined as the individual cases are presented.

There are some diseases, such as cancer, tuberculosis, typhoid fever, meningitis, etc., as to which the court might say, as a matter of law (basing its conclusion upon the state of common knowledge), that the chances of recovery are always speculative and doubtful. There are other diseases as to which, perhaps, the court might say, as a matter of law, that they would yield to proper treatment, basing this conclusion upon the common knowledge of mankind. Between these two classes exists a wide class as to which common knowledge is not so well established; and in these cases the question as to whether the results of a physician's or a surgeon's services would or would not be doubtful or uncertain is a question of fact, and, being a question of fact, is a question for the jury. Juries are frequently called upon to settle the probability of things, and to determine, according to human experience, whether this or that result likely did ensue or will ensue from this or that somewhat problematic cause. For instance, it is a common thing for a court to submit to a jury the question as to whether an injury will prove permanent, and to allow them to assess the damages with reference to their finding as to this question—a question often problematical to a high degree.

Now, if it is practically certain that a physician, by the applica-

tion of known and available remedies, can stop a post-partum hemorrhage, such as the one which the decedent in this case suffered, and likewise practically certain that if the hemorrhage is not stopped the woman will die, and that if the hemorrhage is stopped she will recover; and if the decedent in the present case was suffering from a post-partum hemorrhage, and from nothing else that would likely have produced her death, and she did die, it seems perfectly plain to us that it is merely to indulge a natural and ordinary inference to say that the failure to get the physician, so that the remedies could be applied, was the direct and natural cause of her death. The petition alleges all these things, and we are not in a position to say as a matter of law that they are not true. We do not know whether they are true or not, and it is not a matter of common knowledge; and it seems to us that courts ought not to take judicial cognizance of things which they do not know, and which by common knowledge they can not know. Yet the effect of insistence of counsel is that we ought to hold, as a matter of judicial cognizance, that the cause of the woman's death was speculative, and that the petition alleges a matter incapable of proof by ordinary methods. It may be that when the dead woman's condition just prior to her death is described, those who are informed upon the subject can testify to the jury as to the course of human experience as to these matters, and as to what drugs and appliances the physician had by which the hemorrhage could have been stopped; and if it appears that it was not merely possible that the woman's life would have been saved, but that, with practical certainty, it would have been saved, the jury, without exercising any extraordinary function, may be able to say that the failure to get the physician was the direct, natural, controlling, and proximate cause of her death.

Those who hold that cases such as this are too problematic and speculative for solution by the jury seem to us to make an unwarranted distinction between causal acts of omission and causal acts of commission. For example, suppose that a woman had been recently delivered of a child, and that the physician or midwife had applied packing or some other appliance to her organs with a view of preventing a hemorrhage, and by some wrongful act of commission these appliances were removed and the hemorrhage ensued, but few courts, if any, would hesitate to hold

that it was for the jury to say whether the removal of the appliances was or was not the proximate cause of the ensuing hemorrhage, and, if death should ensue, of the homicide. Still many of these same courts would refuse to let the jury pass upon the question as to whether a negligent act which prevented this same woman from procuring the benefits of these same medical or surgical appliances was the proximate cause of her death, resulting from hemorrhages started on account of the lack of them. We do not see the difference. In the range of criminal law we find the courts holding that parents can be convicted of murder or of manslaughter for allowing a child to die through neglecting to supply the child with food, with clothing, or with medical attention. A number of such cases are referred to in Wharton on Homicide, § 452. As Wharton well says (§ 451) : "A man who is apparently inactive is actually doing something, even though that something is the canceling of something else that he ought to have done. Even sleeping is an affirmative act, and may become the object of penal prosecution, when it operates to interrupt an act on the part of the defendant which the law requires of him, with the penalty of prosecution for his disobedience." Taking the cue from the last sentence in the quotation just made, we may ask that if the picket on duty sleeps, and the enemy slips by him and destroys the camp, is not the negligence of the sentinel the proximate cause of the injury to those whom he is engaged in guarding?

Now, coming back to the case at bar: We are going to reverse the judgment of the lower court in sustaining the general demurrer, and it will thus become a question of proof as to whether the woman's death in this case was the direct and natural result of the defendant's act or not. Before it will be proper to award the plaintiff any damages, the jury should be able not only to trace a connection between a negligent failure of the telephone company to give the plaintiff communication with the physician and the death of the woman, but they should also be able to say with practical certainty that her death was the natural consequence of the defendant's neglect. They must be able to go further and say that the death was not merely the imaginary or possible result of the tortious act, but that according to the course of human experience it was the direct result—that in all human probability this result would not have happened if the defendant's neglect had not hap-

pened, and that the consequences of the neglect itself, and not something else, preponderated most largely in causing her death. But, as the code says, if these damages are the legal and natural result of the act done, they are not too remote to be recovered. For instance, if the jury should believe from the evidence merely that the physician would have had a chance of saving the woman's life, but that her condition was such and the character of the hemorrhage was such that it would not be possible, in the light of human experience in such cases, to say with practical certainty whether she would have survived or not, irrespective of the physician's coming, then they ought to find for the defendant; on the other hand, if they find that the defendant was negligent in its failure to give the husband communication with the physician, and that the physician stood ready and willing to come, and would have come upon the summons, and that he could have arrived at such a time as that his services would have been available, and that it is practically certain that, through his services and the application of such remedies as would have been at hand, he could have prevented or stopped the hemorrhage, and that by the stopping of it he would in all reasonable probability have saved the woman's life, and that by reason of the failure of these things the woman's death was directly brought about, the plaintiff may recover. We do not know what the evidence will be, and we are merely attempting to lay down certain rules which will so guide the jury as that their verdict will not be based on their speculations, or upon the conjuring up of imaginary or possible results, but upon what they find to exist with practical certainty according to the law of ordinary human experience; and that is about all we have to guide us in any case.

4. The petition alleges the decedent's age, expectancy, and earning capacity, and thereby gives the basal facts for measuring the amount of the damages, in the event the jury finds that the plaintiff is entitled to recover. The plaintiff also sets up as an element of damage the mental anguish, etc., suffered through the bereavement. The measure of liability fixed by our code in similar cases of homicide is "the full value of the life of the deceased" (Civil Code (1910), § 4424), and additional damages are not allowed for mental anguish suffered on account of the bereavement occasioned by the death. Therefore, while the judgment of the lower court

sustaining the general demurrer is reversed, direction is given that the trial court shall cause the plaintiff so to amend his petition as to pray for only such damages as are allowable under the rule stated in the code, just referred to.   *Judgment reversed, with direction.*