## 3411. WESTERN UNION TELEGRAPH CO. *v.* FORD.

1, 2. This court held, when the case was here on exception to the judgment overruling the demurrer to the petition, that the allegations of the petition made a cause of action. On the trial these allegations were substantially proved.

3. Where the issue is as to the reasonable probability of saving an eye affected with corneal ulcer, and this is provable only by expert evidence, the opinion of an expert, based on his own experience and knowledge acquired from statistics, that seventy per cent. of eyes affected like the plaintiff's eye are saved by treatment applied in ten or twelve hours after the premonitory symptoms first occur, is competent evidence.

4. Where a contract requires written presentation of a claim within sixty days, the filing of a suit, and service thereon within sixty days, will suffice as a written presentation of the claim, provided the allegations of the petition sufficiently inform the defendant of the identity, nature, and extent of the claim; and this is true although the suit may have been withdrawn or dismissed after filing and service, and another suit for the same cause of action renewed within the statutory limitation. Sufficient notice of the claim having been once given, the effect of the notice is not destroyed by the subsequent exigencies of pleading.

5. The excerpts from the charge, taken in connection with the general instructions, contain no material error. The charge, as a whole, clearly presented, as the true standard of diligence, ordinary care in the transmission and delivery of the telegram after its reception by an agent of the defendant charged with that duty. The words "ordinary care" are self-explanatory, and the failure to define their meaning, in the absence of a timely written request, is not reversible error.

6. Where the evidence demands the finding that a named person was the agent of the defendant, the trial judge is not required to define the legal meaning of the term "agency," or to submit to the jury the question of agency as an issue under the evidence.

7. Under the evidence it was wholly immaterial whether the day on which the telegram was received for transmission was a legal holiday. Irrespective of that question, the jury were authorized to infer that the message could have been transmitted and delivered to the addressee. Besides, the defendant company, having received the message on a legal holiday, was under the duty of using ordinary care in transmitting and delivering it promptly.

8. No material error of law appears; and while the evidence in support of the verdict is not free from doubt and is not entirely satisfactory, yet this court can not say there was no evidence from which the jury, the exclusive arbiters of the facts, could not reasonably have concluded that the defendant was liable in damages.

DECIDED FEBRUARY 24, 1912. REHEARING DENIED MARCH 2, 1912.

Action for damages; from city court of Moultrie—Judge McKenzie. April 22, 1911.

When this case was previously before this court the judgment of the lower court, dismissing the petition on general demurrer, was reversed, it being the opinion of this court that the allegations of the petition set forth a cause of action. Following this decision a trial was had, and a verdict was rendered for the plaintiff, for $5,000; the defendant's motion for a new trial was overruled, and the case is here for review. The allegations of the petition are fully set out in the opinion of the court on the demurrer. *Western Union Telegraph Co.* v. *Ford, 8 Ga. App.* 514 (70 S. E. 65). It is necessary, however, to give a brief statement of the allegations, as well as a substantial statement of the evidence, in order that the questions raised may be clearly understood, and that it may be seen whether the allegations as made were proved.

The plaintiff alleges, that she was suffering from an affection of the eye known as "purulent conjunctivitis, there being symptoms of iritis." She was under treatment for this affection by a specialist who resided at Moultrie, Georgia. This specialist informed plaintiff and her husband that should iritis set in, a corneal ulcer would form on the eye, and, unless promptly stopped, it would spread to the vision and cause the loss of the eye, and he described to them the premonitory symptoms of corneal ulcer, so that they would recognize it and know when to send for him promptly. About 5 o'clock on the morning of July 5, 1909, plaintiff felt these premonitory symptoms. She thereupon immediately caused her husband to send a message by hand through the country to Dr. Odum, who was treating her, in connection with the specialist, for this eye trouble, and who lived at Barney, Ga., with a request that he send a message to the specialist, asking him to come to her residence. There is no telegraph office at Barney, so this message was telephoned by Dr. Odum from Barney to Quitman, Ga., and there delivered to the defendant company, this being the usual way that messages intended to be telegraphed from Quitman were transmitted from Barney to Quitman. Between 8 and 9 o'clock on the same morning the message was delivered by Dr. Odum to the defendant at Quitman, and was as follows: "Barney, Ga., July 5. Dr. Jenkins, Moultrie, Ga. Come out to J. M. Ford's place. [Signed] Dr. Odum." It is alleged, that this telegram could have

been delivered by ordinary diligence within fifteen minutes after the receipt thereof to Dr. Jenkins, the addressee, as Moultrie was within fifty miles of Quitman by wire; that the defendant company negligently failed to deliver this message to the addressee until 10.30 o'clock on the morning of July 6, a delay of more than twenty-five hours; that if the message had been delivered promptly, Dr. Jerkins "could and would have immediately gone to petitioner's house, and he would have at once stopped the spread of the ulcer before it reached the vision of the eye, and would have saved petitioner's said right eye." On receiving the telegram he did go to plaintiff's house, and, although he succeeded in arresting the progress of the ulcer, it had in the last twenty-four hours immediately preceding his arrival made such progress that the vision of the right eye was destroyed, making it necessary to have the eye removed to prevent the loss of the other eye. Dr. Jerkins lived in the city of Moultrie. His residence and office was within 400 yards of the defendant's office in Moultrie. He was at his office and residence all day on July 5, and the message could, in the exercise of ordinary care, easily have been delivered to him early on the morning of July 5 in ample time for him to have gone to petitioner's home and arrested the progress of the disease, and if he had received the message, he would have gone to her and have arrested the disease and saved her eye. Except for the fact that she was relying on the defendant to promptly transmit the message, she could and would have made other arrangements to secure the prompt attendance of the specialist, and she seeks to recover damages for the negligent failure of the telegraph company to transmit and deliver the message to the specialist, whereby he was prevented from earlier attendance and earlier treatment of her eye, claiming that this negligence was the proximate cause of the loss of her eye. She claims damages not only for the loss of the eye, but for mental anguish and physical pain which she suffered from the progress of the ulcer, and the mortification she will suffer from the loss of her eye during her entire life; from the resulting danger to the other eye, and from the apprehension that she will become permanently blind. An amendment to the petition alleged, that the message in question was delivered to the defendant company at Quitman, Ga., between 9 and 10 o'clock on the morning of July 5, 1909, and also that the ulcer reached the condition by and from which the

vision of the eye was destroyed after 12 o'clock on the night of July 5, and that if the message had been delivered to Dr. Jerkins at any time prior to 8 o'clock on that night, he would have responded to the telegram, would have come to petitioner's home, would have stopped the spread of the ulcer before it reached the vision of the eye, and could and would have saved petitioner's eye.

It was not controverted that the plaintiff was suffering from an affection of the eye as described; that on Friday night, July 2, Dr. Jerkins discovered the premonitory symptoms of corneal ulcer, and warned her and her husband at that time that if it developed and was not promptly checked, it would destroy the vision of the eye; that she felt these premonitory symptoms on Monday, July 5, about 5 o'clock a. m., and that her husband wrote a note to Dr. Odum and sent it to Barney, where Dr. Odum lived, six miles away, and Dr. Odum communicated this message to one Harrell, who was the representative of the South Georgia Railroad Company at Quitman, asking him to send the message to Dr. Jerkins. Here appears the first conflict in the evidence. Dr. Odum, for the plaintiff, testified, that he communicated this message to Harrell between 7 and 8.30 o'clock, certainly not as late as 10 o'clock on the morning of July 5; that while he did not advise Harrell of Mrs. Ford's condition and the danger that might result from delay, he nevertheless urged upon him the prompt sending of the message. Harrell testified, for the defendant, that he received this telephone communication from Dr. Odum at 10.20 o'clock Monday morning; that upon receipt of the message he noted the time of its reception, by a pencil memorandum made upon a carbon copy of the telegram; that when he received the message from Dr. Odum, he told him that the day was being observed as a legal holiday, and that it was doubtful if the message could be forwarded. Dr. Odum denied that Harrell stated to him at that time that it was a legal holiday, or that it was doubtful if the message could be sent; but testified that Harrell did make this statement when he called him the second time, at 2 o'clock, to ascertain if the message had been sent. Dr. Odum testified, however, that he knew that the day was a legal holiday. There is no telegraph office at Barney. The South Georgia Railroad Company had a private telephone line operating between Barney and Quitman. If a person at Barney desired to send a telegram over the Western Union Telegraph line from Quitman,

39

he could give it to the agent of the South Georgia Railroad Company at Barney, and this agent would collect from him the toll charged by the telephone line for communicating the message to the telegraph operator at Quitman, and would also collect the amount of the message that would have to be paid to the telegraph company at Quitman for forwarding the message over its line. The agent of the railroad company at Barney, upon receiving this message, would call up the agent of the South Georgia Railroad Company at Quitman, who in this case was Harrell, and communicate the message to be sent, and this agent of the railroad company at Quitman would write out the message on a blank of the telegraph company and send it to the telegraph office for transmission, or call up the telegraph office and have it send a messenger for the message. In the present instance Dr. Odum went to the depot of the South Georgia Railroad Company at Barney, and tried to get the agent to call up Harrell at Quitman. The agent endeavored to do so, but could not get him over the telephone. Dr. Odum thereupon called up the Western Union at Quitman and told the operator that he had a message. The person who answered the telephone at the Western Union office directed him to give it to the railroad agent at Barney, as they wanted pay for it, and Dr. Odum replied that he could not get up the agent. Subsequently Dr. Odum called Harrell up over the local line and gave him the message as stated. Harrell testified, that the above method of sending messages from Barney to Quitman, to be transmitted over the Western Union Company's lines, was the general custom, and that the agent of the railroad company collected not only the toll for the telephone company, but also the toll for the telegraph company and had monthly settlements with the telegraph company as to the tolls due it. Dr. Odum further testified, that in his telephone communication with the Western Union office at Quitman the operator told him that he could make an arrangement with the South Georgia Railroad Company by which the message would be transmitted to the Western Union Telegraph Company at Quitman, and that he thereupon communicated with Harrell over the long-distance line at Quitman, gave him the message, and told him that he would go down to the office of the South Georgia Railroad Company at Barney and pay for the message, and to be sure to get the message off, and Harrell replied that he would. Harrell testified, that he

was acting in the matter for the sender of the telegram and for the telephone company; that he had no connection with the Western Union Telegraph Company, but that the Western Union Company got twenty-five cents, which was collected by the agent of the railroad company for sending the message from Quitman to Moultrie. The agent of the Western Union Company at Quitman testified, that July 5 was a legal holiday; that on legal holidays the office hours of the company were from 8 to 10 in the morning, and from 4 to 6 in the afternoon, and that the office at Moultrie observed the same hours; that the telegram in question was given to him at Quitman by the agent of the South Georgia Railroad Company; that he does not remember in this particular case how it reached the office, but that it was customary for his office to send messengers when they were called for to the railroad office to get the messages; that this telegram was received at his office at 10.33 o'clock on July 5; that on receiving the message he put on it a memorandum of the time of its reception; that he immediately called the Moultrie office over the local wire; that the Moultrie office could not have been open at that time (in view of the custom of observing legal holidays) ; that he received no answer at the Moultrie office; that he again called the Moultrie office, at 11 o'clock, and again at 11.20, and next at 12 o'clock; that he called again at 12.50, but received no answer to any of the calls; that according to the records of his office, he did not call the Moultrie office again until next day, July 6, at 9.45 o'clock; that he remembers no effort to get the message to the Moultrie office between 12.50 on July 5, until 9.45 on July 6; that when he received the message he had no notice from Harrell that Mrs. Ford had any connection with the telegram, or that her eye was in a critical condition, nor any statement indicating urgency in transmitting the telegram to the addressee. The evidence further shows that the office at Moultrie was open from 8 until 10 a. m., July 5, and again from 4 until 6 in the afternoon, but that no message was received from Quitman, and in fact no message could have been received direct from Quitman over the local wire, because the wire was not in good order. The message may have been sent from Quitman to Moultrie by way of Savannah, Jacksonville, or Atlanta, during the hours that the offices were open on that day. It was further shown that the Postal Telegraph Company had an office at Quitman, connecting with Moultrie, which was open on

July 5, and that there was telephone communication between these two places. Jones, the agent of the Western Union Company at Quitman, testified, that if the lines were working and in good order, it would take about a minute to send a message of seven words from Quitman to Moultrie, and that he and his brother were the agents of the Southern Bell Telephone Company at Quitman, he being the agent of the Western Union at Quitman also; that he did not try to send the message by telephone to Moultrie. He testified also as to his method of transmitting telegraph messages between Barney and Quitman, intended to be sent beyond Quitman by way of the telegraph company's lines, stating that such messages are sent from Barney over long-distance telephone, "and the South Georgia Telephone Company collects for the message and turns it over to us, and we send it through, and at the end of the month we have a settlement between us for the toll on these messages;" and this arrangement between the Western Union Company and the South Georgia Company was similar in character to the arrangements the Western Union Company had with any "concerns in Quitman whose credit was good." Jones further testified, that after failing to get Moultrie directly, he made one effort to get it by way of Savannah, in order to send the message, but that the operator at Savannah declined to take the message, stating that he had the same wire that the office at Savannah had to Moultrie, and that he had as good a chance to get Moultrie as Savannah had. The foregoing is a statement, in substance, of the evidence tending to illustrate the question of negligent conduct on the part of the defendant telegraph company in receiving and transmitting the message in question.

Dr. Jerkins gave a description of the condition of the plaintiff's eye on the Friday before the Monday in question, and told of his discovery then of the premonitory symptoms and the probability of the formation of a corneal ulcer, and of the information which he gave to the plaintiff and her husband as to the necessity for prompt action when she felt these symptoms. He testified, that he was in his office at Moultrie all day July 5; that if he had received the message on July 5 he would have gotten off as quickly as possible in response thereto, and could have reached the home of the plaintiff in one hour in his automobile; that he did not receive the telegram until July 6; that he immediately left for plaintiff's home,

reaching there about 12 o'clock; that he found that the corneal ulcer had developed, and he began treatment therefor, but that it did not yield to treatment, and that it finally progressed until the vision was lost and it became necessary to take out the eye in order to save the other one. "If I had been able to reach this lady by 12 o'clock noon on July 5, it is impossible to say just what would have been the result of the treatment of this corneal ulcer, which I found developed when I got there. My opinion is that I could have healed the ulcer without leaving a very large scar. She would have had some vision if I could have healed it before. If I could have seen her at 8 or 9 o'clock on the night of July 5, 1909, I would have had a better chance than later. I could not say that it could have been healed at that time. I do not know how fast it was developing. I could only say that I could have had a better chance at it earlier. This ulcer spread pretty fast. Had this ulcer first made its appearance at 5 o'clock July 5, I could not say, I do not know, at what time it would advance to such a state as to be a hopeless case with reference to treating the eye, with reference to saving the sight. An ulcer of this nature spreads very fast. . . I do not know what condition it was in on Monday morning.. If that purulent discharge was not under control on Monday morning, when the well-developed symptoms of the corneal ulcer appeared so that Mrs. Ford could recognize it, the difference of either ten or twelve hours in my getting there would have produced an effect in reference to stopping that ulcer, *in all reasonable probability. I would have been able to have kept this discharge out of the ulcer,* and have kept it under better control. If the purulent discharge was not in control at 6 or 7 o'clock on the morning of July 5, with the symptoms of corneal ulcer so evident that Mrs. Ford herself could recognize them, and I could not have gotten there until 5 or 6 o'clock that night, it would have been pretty doubtful at that time that I could have stopped the spread of the corneal ulcer and saved the eye, if the discharge had still been going on. If the purulent discharge was not under control on the morning of July 5, and I had not been able to get there until about 5 or 6 o'clock that night, the probability would have been against my being able to save the eye, but the discharge was under control the last time I saw it, on Friday or Saturday, and there was not any discharge the next time I saw it, Tuesday. . . It might have been I could

not have stopped it from spreading in the beginning, *but I be-
lieve I could right after it started. If I could have seen it right
after it started, there would have been a reasonable probability
that I could have saved the eye.* If I could have seen it for twelve
hours, what the probabilities were I of course could not say, but
every hour would have helped; I believe I could though. If I could
not have seen it until 5 or 6 o'clock the evening before, the reason-
able probabilities, the chances against my being able to save the
eye, would be about equal. . . The percentage . of eyes saved,
affected like this eye was, provided you get to them within 10 or
12 hours after you feel the sharp pains that occur, taking every-
thing into consideration, is probably about seventy per cent. There
is probably not one in a hundred that would be affected just alike;
but I should think after this iritis had subsided, an ulcer in this
condition ought to be controlled in that length of time, probably
seventy per cent. of them. I could not swear to it; that is my
opinion. . . When I got there something like half of the sight
on the upper part had not been covered. It was a critical case for
the sight from the very jump. If it extends with equal rapidity in
all directions, every minute the sight is dying. I did not arrest the
disintegration of the tissue. It kept right on until it passed over
the entire pupil. The cornea is bigger than the pupil. It covers
the whole colored portion of the eye. With iritis on one side of the
cornea and conjunctivitis on the other side, the sum total of the
effects of these two diseases would be to put the vision out of com-
mission, and into a weakened condition where it would be more sus-
ceptible to the ravages of corneal ulcer than otherwise. And in
order to arrest corneal ulcer under such circumstances, it is much
more difficult than it would have been if it had occurred outside of
any connection with conjunctivitis and iritis. I have been treat-
ing diseases of the eye for about twelve years. . . I have seen
a few cases like this case in my practice. I do not recall how many
cases. Of these cases similar to this I only lost one. . . I have
known one to get well. Where iritis and conjunctivitis had set in
and when the first symptoms of corneal ulcer were seen, whether it
would be possible to save the eye if you neglected the treatment two
days and nights is hard to tell. I do not think so. When I saw
this lady the last time before Tuesday, July 6, she did not have a
developed case of corneal ulcer."

Dr. Dunbar Roy, an oculist from Atlanta, who had been engaged in the practice of his specialty for eighteen years, having studied both in this country and in Europe, testified, in substance, that if the plaintiff had been suffering from purulent conjunctivitis and iritis on Friday, and on that day symptoms of corneal ulcer were forming, and by the following Monday morning by 5 o'clock these symptoms had become so plain as to cause a roughness indicating breaking down of the cornea, the chances to save the sight, if treatment was not begun until after that time, were very poor, because of the fact that the cornea has very little vitality, and if it once becomes affected, the chances are that it is going on to destruction; that under these conditions the chances for recovery would be extremely slim; and that if on Monday morning at 5 o'clock the patient herself recognized the breaking down of the cornea from this ulcer, if the physician could have gotten to her that afternoon at 5 o'clock, the chances would have been against saving the eye, although it would be impossible to say that the eye could not have been saved. If the physician could have gotten to the patient at 8 o'clock Monday morning, three hours after she had noticed the symptoms, it is impossible to say what would have been the reasonable probability of saving the eye at that time. If the outcome is the loss of the eye within thirty hours after the patient begins to feel the roughness, I do not believe anything in the world would have saved the eye or the cornea, even had the physician reached her earlier.

*W. A. Covington, Dorsey, Brewster, Howell & Heyman,* for plaintiff in error.

*Shipp & Kline,* contra.

RUSSELL, J. (After stating the foregoing facts.)

1. The first question which arises for decision is whether, under the evidence, the telegraph company was guilty of culpable negligence in delaying the transmission and delivery of the message to the physician at Moultrie. The determination of this issue depends almost entirely upon the relationship which Harrell, the agent of the South Georgia Railroad Company at Quitman, occupied towards the parties. Was he the agent of the defendant telegraph company in receiving the message from Dr. Odum, or was he the agent of the sender of the message, or was he in a sense the agent of both the telegraph company and the sender? It is earnestly con-

tended by learned counsel for plaintiff in error that Harrell was not the agent of the Western Union Telegraph Company in any sense; that the evidence demanded the finding that he was solely the agent of the sender in receiving and sending this message to Jones, the operator of the Western Union Company at Quitman. We have given the evidence bearing on this point careful consideration, and we have come to the conclusion that Harrell occupied the dual capacity of agent of both the sender and the Western Union Telegraph Company in receiving and sending the message; that in so far as the transmission of the message to the operator at Quitman to be sent to Moultrie is concerned, he was acting as the agent of the Western Union Telegraph Company. The undisputed evidence shows that in the absence of any telegraph station at Barney, Georgia, it was the custom for the agent of the South Georgia Railroad Company at Barney to receive messages, and not only to collect a toll for the railroad company for sending the message to Quitman over its telephone wire, but also to collect for the telegraph company the toll due to it for the transmission of the message from Quitman to its destination. In this case, in addition to this custom, it appears that Dr. Odum was specially directed by the operator of the Western Union Company at Quitman to send this message through the agent of the railroad company, by way of its telephone wire from Barney to Quitman, and to pay to this agent the toll due for the message to be sent to Moultrie. The Western Union Telegraph Company, having thus authorized the agent of the railroad company to receive messages intended for it, and also to receive in its behalf pay for such messages, constituted the railroad agent its agent for these purposes. We think that under these facts the question of Harrell's agency for the purpose of receiving the message for the telephone and telegraph companies was not issuable, and the court did not commit any error against the telegraph company in submitting this question of agency, in a general way, to be determined by the jury. Harrell, therefore, being the agent of the telegraph company at Quitman, was under the duty to exercise reasonable and ordinary diligence in transmitting the message, when he received it, to the operator at the telegraph company's office in Quitman. The evidence as to when Harrell received the message from Dr. Odum is in conflict. Harrell testified positively, refreshing his recollection by a memorandum on the carbon copy

of the message, that he did not receive the message from Dr. Odum until 10.20 o'clock Monday morning, and that he immediately called up the operator and informed him that he had the message, and requested him to send a messenger for it. Dr. Odum testified that he had transmitted over the telephone wire from Barney to Quitman the message to Harrell between 7 and 8.30 o'clock a. m., certainly not later than 10 o'clock Monday morning. This conflict in the evidence could only be determined by the jury. They had the right to accept as the truth the statement of Dr. Odum. Assuming, therefore, that Harrell received the message from Dr. Odum as late as 8.30 o'clock Monday morning, he was under a duty to use ordinary diligence in transmitting it to the operator at Quitman. The operator testified that he did not receive the message from Harrell until 10.30 o'clock. If Harrell received the message at 8.30 o'clock and delayed transmitting it to the operator at Quitman until 10.30, it was for the jury to say whether these two hours' delay was unreasonable and negligent. It was also for the jury to determine whether the prompt performance of his duty by Harrell in transmitting the message to the operator at Quitman and the proper exercise of diligence on the part of the operator in transmitting the telegram to the addressee, Dr. Jerkins, at Moultrie, would have enabled the latter to receive it in time to have gotten out to the plaintiff's home by 12 o'clock Monday, July 5. Moultrie is only 36 miles from Quitman. Unquestionably, if the message had been received by Harrell at 8.30, and he had at once transmitted it to the operator at Quitman, and the operator had used due diligence in transmitting it to the addressee at Moultrie, it would have been received in all probability before the office at Moultrie had closed on account of the legal holiday. If Dr. Jerkins had received the dispatch at 10 o'clock, according to his evidence he would have gone immediately to the home of the plaintiff, and would have reached her in an hour or so; and if he had reached her before twelve o'clock on that day, according to his opinion as an expert, there was a reasonable probability that by treatment he could have saved the plaintiff's eye. It is insisted that neither Harrell nor the operator at Quitman knew of the urgent character of the message, or of the critical situation of the plaintiff and the necessity for prompt transmission and delivery; and this view is sustained, so far as the operator is concerned, although there is some evidence that Harrell

had been urged by Dr. Odum to send the message promptly. We do not think, however, that this makes any material difference. Even without any knowledge of the urgent character of the message, it was a question for the jury to determine, under the evidence, whether the agents of the Western Union Telegraph Company at Quitman exercised ordinary diligence in sending the message which they had received, regardless of any knowledge of its urgency; and we are not prepared to hold that the jury would not be authorized to find that the delay of over two hours in transmitting the message from Quitman to Moultrie was an unreasonable and culpable delay. We therefore conclude that the jury were authorized, on this branch of the case, to find that the defendant telegraph company, through its agents, did not exercise ordinary diligence in transmitting and delivering the message to Dr. Jerkins, the physician at Moultrie, and that this delay prevented the physician from giving prompt medical treatment to the eye of the plaintiff.

What is said renders unnecessary any discussion of the sixth ground of the amended motion for a new trial.

2. The second question for determination is not free from doubt and difficulty. Was the negligent delay of the telegraph company in transmitting and delivering the telegram to the physician, whereby he was prevented from earlier attendance on the patient and medical treatment of the eye, the proximate cause of the loss of the plaintiff's eye? The general rule is that there must be some direct and proximate connection between the negligence or wrong done and the physical injury suffered, to warrant a recovery in damages, and this causal connection must be proved by facts based upon direct testimony, or the opinion of experts, and must not depend upon conjecture or guesswork. In this case there could be no recovery under the law, unless the evidence shows that it was reasonably probable that the plaintiff would not have lost her eye had the doctor reached her in time, after promptly receiving the telegram, and by proper treatment could then have saved the eye; and this evidence must have such probative value as to produce a reasonable conviction without resorting to mere conjecture, inconclusive inferences, or bare possibilities. *Western Union Telegraph Co.* v. *Ford*, 8 *Ga. App.* 514 (70 S. E. 65). It seems to us that sections 4509 and 4510 of the Civil Code (1910) embody, in a com-

prehensive statement, the rule of law on this subject: "If the damages are only the imaginary or possible result of the tortious act, or other and contingent circumstances preponderate largely in causing the injurious effect, such damages are too remote to be the basis of recovery against the wrong-doer." "Damages which are the legal and natural result of the act done, though contingent to some extent, are not too remote to be recovered. But damages traceable to the act, but not its legal or material consequence, are too remote and contingent." As pointed out by Judge Powell in discussing the question in *Glawson* v. *Southern Bell Tel. Co.,* 9 *Ga. App.* 455 (71 S. E. 747), the courts of this country are in wide disagreement as to whether damages which result through the failure to get a physician, so that the progress of a malady can be checked or the effects of a wound can be allayed, and injurious results prevented, are speculative and remote, within the meaning of the rules just quoted. Some courts go almost to the extent of holding that it is impossible, from a human standpoint, to say what would be the result of a physician's services in checking almost any known disease, or of relieving almost any imaginable physical hurt or injury. And in that case this court, following the rule laid down in the *Ford* case, supra, accepts the doctrine that the question is to be determined by the jury, and that in determining this question they can accept the opinion of experts.

If the jury in the present case were authorized to believe, from the testimony of Dr. Jerkins, that he could have saved the plaintiff's eye if he had reached her Monday morning by 12 o'clock, or if there was a reasonable probability that he could have saved her eye at that time by proper treatment, the standard of proof laid down by both the *Ford* and *Glawson* cases, supra, was reached. The evidence of Dr. Jerkins is not entirely satisfactory on this point, but, taking his evidence all together, we can not say that the hypothesis that he would probably have saved her eye if he had reached her in time is not fairly deducible. He testified that if he could have seen and treated the eye before 12 o'clock Monday, there would have been a reasonable probability that he could have saved it; and, from his opinion and experience as an expert, he states that 70 per cent. of eyes affected like this eye was, provided a physician could get to them and treat them within ten or twelve hours after the occurrence of the first premonitory symptoms of corneal ulcer

appears, could be saved. Of course, he was not positive that he could have saved this eye even if he had reached it early Monday morning. In the very nature of things he could not have been positive. This standard of proof is not possible to be reached in such cases, and we are compelled to make a decision within the limitations of human fallibility; and while, as stated, we are not entirely satisfied as to the character of the proof on this branch of the case, yet we do not feel that we would be justified in setting aside a verdict of the jury, under this evidence, which was approved by the trial judge. In other words, we can not say, as a matter of law, that the question is one purely problematical and speculative, and unless there is some prejudicial error in the conduct of the trial, we will leave the solution of this issue where the law places it, in the hands of a fair, impartial, and intelligent jury.

3. Error is assigned upon the ruling of the court in admitting in evidence the testimony of Dr. Jerkins as follows: "What percentage of eyes are saved, affected like this eye was, provided you get to them say within 10 or 12 hours after you feel the sharp pain that occurs?" The reply to this question was that the average would be 70 per cent. This evidence was objected to, on the ground that it was a matter of hearsay and not relevant to the issues in the case. Certainly the question was relevant to one of the two controlling issues in the case, and we think it was within the province of expert testimony. If based upon the experience of the witness as an expert, it would be admissible for that reason. If it was based upon the concensus of opinion of specialists, we think it would be admissible for that reason. The evidence is similar in character to that presented by statistics gathered by learned and experienced men, such as the average of life contained in mortality tables, and other kindred subjects.

4. At the conclusion of the plaintiff's evidence a judgment of nonsuit was invoked, on the ground that the contract between the sender and the defendant company contained, as a condition precedent to a right of recovery, a stipulation that the claim should be filed by the plaintiff against the company within sixty days after the filing of the message, and there was no evidence that this claim had been filed as required by this condition of the contract. This objection was met by proof that the plaintiff had filed within the sixty days a suit for damages against the defendant company, in

which her case was fully set forth; that this suit was withdrawn, and subsequently, within the legal limitation, the present suit for the same cause of action was filed; and it is insisted by the plaintiff that this was equivalent to a compliance with this condition of the contract. In answer to this position it is contended by the plaintiff in error that the suit first filed was not a compliance with this condition, and that certainly, when the suit was withdrawn or dismissed, it became functus officio, and was as though no claim had ever been made.

In our opinion the filing of this suit was a substantial compliance with this condition of the contract. *Postal Telegraph-Cable Co.* v. *Morse*, 5 *Ga. App.* 504 (63 S. E. 590). And we do not think that a subsequent temporary withdrawal of the suit destroyed the effect of the filing of the suit as a claim made against the company for damages. The first suit, filed within the sixty days from the time when the cause of action arose, had been served upon the company. They then had notice of the claim for damages, and the subsequent temporary withdrawal of the suit could not have taken away from the company the notice previously acquired by the filing and service of the suit.

5. The excerpts from the charge of the court, taken in connection with the entire charge, contain no material error. We think the charge as a whole clearly and distinctly instructed the jury that the standard of diligence required of the defendant company with reference to the transmission and delivery of the message was that of ordinary care, and we do not think that the jury could possibly have inferred, from the excerpts set out and objected to, that any higher degree of diligence was required from the defendant than that of ordinary care. It was not necessary for the judge to define the words "ordinary care," in the absence of a timely written request. They are self-explanatory, and it will be presumed that the jury understood the ordinary and common significance of these terms.

6. The assignments of error on the failure of the court to charge that Harrell was the agent of the plaintiff, and not of the defendant telegraph company, are fully covered by the second division of the opinion. The failure of the court to define to the jury the legal meaning of the word "agency," even if erroneous, was not harmful, in view of the fact that, as heretofore expressed

in the opinion, the undisputed evidence demanded the finding that Harrell was the agent of the defendant company in receiving and transmitting the message to the operator at Quitman.

7. The failure to charge the jury on the right to keep its office closed on legal holidays was immaterial, under the facts of this case. The jury were authorized to believe that the question of legal holiday was not relevant. The message was received by the agent, Harrell, and, in the exercise of ordinary diligence, could (at least the jury would have been authorized to so infer) have been transmitted and delivered during the hours when the offices both at Quitman and Moultrie were kept open, under the rules of the company, on legal holidays. Besides, the company accepted the telegram on a legal holiday, and was under the duty to exercise ordinary diligence, after having accepted it, to transmit and deliver it to the addressee on that day, notwithstanding the fact that the day was a legal holiday.

8. It is contended in the last ground of the amended motion for a new trial that the court erred in not restricting the right of recovery to damages for a partial failure of vision, since Dr. Jerkins's testimony, considered most favorably for the plaintiff, only bore the construction that, even if he had reached the plaintiff in time, he could only have partially saved the vision of the eye. The evidence of Dr. Jerkins on this point is not entirely clear; but he does state that there was a reasonable probability that if he had reached the plaintiff in time, her vision would have been preserved. He does not say whether this preservation would have been partial or complete, and the jury were authorized to draw the latter inference from his evidence, taken as a whole. The issue was not so clearly and distinctly made as to have demanded from the court a pertinent charge, without a timely written request.

After giving the entire case a most careful consideration, we fail to discover any error of such a material character as would warrant the grant of another trial.

*Judgment affirmed. Pottle, J., not presiding.*