### 4073.  SOUTHERN BELL TELEPHONE & TELEGRAPH CO. *v.* GLAWSON *et al.*

1. A judgment of the Court of Appeals affirming a judgment overruling a general demurrer to a petition is the "law of the case" throughout all subsequent stages of the trial, and is binding upon the parties, even though, after its rendition, and before final judgment in the case, the Supreme Court in another case renders a decision which conflicts with that announced by the Court of Appeals.

2. The evidence was sufficient to support the averments in the petition in reference to the measure of damages and the right of the plaintiff to recover, if the defendant was negligent as alleged.  (POTTLE, J., dissents.)

3. Telephone companies are required to exercise only ordinary care promptly to furnish a subscriber means of communication over their lines with other subscribers.  Failure to exercise such care authorizes the recovery of whatever damages may proximately result from this breach of duty. Where, however, suit is brought against a telephone company for damages alleged to have resulted from the negligent failure to give a subscriber telephonic connection, the burden is on the plaintiff to prove negligence.  Even if proof of a failure to give the connection raises an inference of negligence, the inference is removed when it appears that the telephone company has exercised all ordinary care and diligence, and that, notwithstanding the performance of this duty, some portion of the delicate mechanism comprising the telephone system got out of order, from some unknown and unforeseen cause against which ordinary care could not guard.

DECIDED OCTOBER 3, 1913.

Action for damages; from city court of Americus—Judge Littlejohn presiding. January 31, 1912.

Glawson brought an action against the telephone company to recover damages on account of the death of his wife. He resided in the country, a distance of about seven miles from Americus, and had in his house a telephone connecting with a switch-board in Americus, through which communication could be had with other subscribers. In the night of October 2, 1909, his wife was threatened with a miscarriage, and about 3 o'clock in the morning of October 3 he obtained telephone connection with his physician, who resided in Americus, and was advised by him to apply certain

remedies. The plaintiff then hung up the receiver, thus closing the circuit. Shortly after 3 o'clock, the condition of his wife becoming alarming, he again signalled the telephone operator for the purpose of obtaining communication with the doctor, to advise him to come at once. He made repeated efforts to obtain the connection, but received no response from the operator until the lapse of more than two hours, when the connection was given and the physician urged to come immediately. The physician went at once, but reached the plaintiff's house too late to relieve his wife, and she died in consequence of a post-partum hemorrhage, following a miscarriage. It is alleged that all of the telephone mechanism was in good order, and that the defendant was grossly negligent, in that its servants in charge of the switch-board negligently, wilfully, and wantonly failed and refused to respond to the plaintiff's call, and that but for this negligence the physician could and would have reached the plaintiff's house in time to save the life of his wife. More particularly the petition charges the defendant with negligence (1) in failing to give the plaintiff connection with the physician's telephone, (2) in failing to answer the plaintiff's signal and give the desired connection, and (3) in that the servants of the defendant, who knew or ought to have known that the plaintiff would desire to communicate with his physician, either wantonly or of their own fault failed to hear, or else wilfully refused to answer the signal and give the desired connection. A general demurrer to the petition was overruled, and the trial resulted in a verdict in favor of the plaintiff for $5,000. The defendant's motion for a new trial was overruled.

*H. E. W. Palmer, Brutus J. Clay, W. P. Wallis, McDaniel & Black,* for plaintiff in error.

*Robert L. Berner,* contra.

POTTLE, J. 1. The judgment overruling the demurrer was affirmed by this court at a previous term. *Glawson* v. *Southern Bell Telephone &c. Co.,* 9 *Ga. App.* 450 (71 S. E. 747). That decision became "the law of the case," binding upon the parties throughout all subsequent stages of the trial. We can not, therefore, upon the present writ of error, even if we were disposed to do so, review the former decision. *Southern Bell Telephone &c. Co.* v. *Glawson,* 140 *Ga.* 507 (79 S. E. 136). It follows that if the plaintiff proved his case substantially as laid in the petition, the

evidence is sufficient to support the verdict in his favor; otherwise not.

2. The writer is of the opinion that the evidence is not sufficient to support the averment in the petition that if the plaintiff had obtained telephone connection with his physician, the physician would have immediately responded, and could and would have reached the plaintiff's home in time to save the life of his wife, and that the remedies which he would have applied would have had this effect. Upon this point the writer is of the opinion that the evidence is too speculative and conjectural, and that the decisions of the Supreme Court in *Seifert* v. *Western Union Tel. Co.*, 129 *Ga.* 181 (58 S. E. 699, 11 L. R. A. (N. S.) 1149, 121 Am. St. R. 210), and *Southern Bell Tel. Co.* v. *Reynolds,* 139 *Ga.* 385 (77 S. E. 388), are controlling. These two decisions have been recently expressly approved by the Supreme Court. *Southern Bell Tel. Co.* v. *Glawson,* supra. The majority of this court are, however, of the opinion that the evidence substantially supports the averments of the petition upon the question of damage, and that the law relating to this question is settled in the plaintiff's favor by the decision of this court affirming the judgment overruling the demurrer.

3. We are all agreed that the evidence did not authorize a finding that the death of the plaintiff's wife was due to any act of the defendant, of either omission or commission, which in law amounted to negligence. It appears, from the evidence, that under the rules and regulations of the defendant at the Americus office, the night operator is allowed to sleep in a room situated a few feet from the switch-board. In the daytime and at night, until the pressure of business is over, the operator remains at the switch-board, and subscribers signal the operator by means of a small disk or drop, which is visible to the operator as soon as the connection is made by the subscriber, either by removing the receiver from his telephone or by turning a crank, according to the system in use. At night there is on the switch-board a night-bell circuit. Throughout the day this circuit is not in service, but it is put on when the operator retires for the night. When the night circuit is in operation, upon a signal from a subscriber the visual signal or drop on the switch-board comes in contact with the night circuit and causes a gong or bell to ring loudly enough to arouse the operator. The contact touches on a very small circuit very lightly and is considered a

delicate mechanism. It frequently gets out of order, and the cause of the disturbance is rarely discovered. About six o'clock in the evening before the husband sought to obtain connection with the physician, the night circuit was tested and found to be in good working order. The night-signal system used by the defendant was the one in general use by telephone companies and the best known to the service. When Glawson communicated with his physician the first time the operator had not retired and had not put on the night circuit. After his conversation was over, the night circuit was put on and the operator retired. She did not hear the bell ring and did not know that Glawson had signalled again until 5:20 in the morning, when she was called by a signal on another circuit, and she then saw the drop signal at Glawson's number. She immediately called him and connected him with the physician's telephone. When the operator retired she supposed the night circuit was in order, and knew nothing to the contrary until she saw the day signal as above stated. Early in the morning, after it was found that the night-bell would not ring, the mechanism was inspected. The condition then found is thus described by the inspector. "The night-bell contacts were slightly bent, just enough to keep the night alarm from operating, a very small fractional part of an inch. The distance between that contact of the bell wouldn't be the thickness of a newspaper. The effect of that slight lack of contact with the gong would be when the phone was rung the night alarm would fail to operate,—it wouldn't ring. We have a little shutter in the office, connected with the subscriber's line, which operates when the subscriber rings the bell, to notify the operator that she is wanted on that line, and the night-bell contacts are, you may say, an emergency arrangement for the use of the night operator during the hours when she is supposed to be asleep. She connects on a night-bell, in which there is a fine spring and wire, and when the shutter falls it pushes the spring to the wire and closes the contact and causes the emergency bell to ring. Now, if this spring gets bent and fails to connect with the wire, it would cause the night-bell to fail to ring. The shutter that I spoke of is a little metal arrangement about an inch square, and there is one at each line, and, when the subscriber turns his crank, that causes the little catch that holds the shutter to lift up, and the shutter drops down, disclosing a surface of a different color to the operator,

and shows her that that party is calling. If she was not present and the night-gong was on, that would not disclose that fact to her. As to the operating at night on that particular line, we have a switch on the switch-board which the night operator cuts when she retires, and which is in connection with the night-bell, and which causes the night-bell to operate during her absence from the switch-board. Dropping that little shutter that I spoke about, when the subscriber has rung his bell by turning his crank, causes the night bell to ring; the shutter falls down and causes the little spring to come into contact with the wire, and completes the circuit and causes the night-bell to ring. On the next morning I found that spring a very small part of an inch, a fractional part, less than the thickness of a sheet of paper, from the wire, and in that condition the night-bell would not operate and the operator could not get the signal. I made the adjustment in that same spring so that it would ring the bell. The apparatus that was in use on that occasion was the standard equipment for that class of service." "There are several ways in which that spring could get bent so as to keep it from making the contact that I have just described. It doesn't take much force to bend one if it comes from the right direction; it could be bent very easily by any slight force, and be done in such a manner that it would not make the contact. It could have been hit by some of the operators on the switch-board while the operator was at work on the switch-board; and that could be done without the operator detecting it. She wouldn't know until it was called to her attention by the night-bell failing to operate while she was looking at it; it would be practically concealed from her; there is nothing to disclose it to her attention. It doesn't take much force to make the contact with that spring. It is a very fine spring, very delicate, necessarily so. That shutter might fall with about the weight of a half-dollar, the force of a half-dollar placed perpendicularly and allowed to drop on the flat surface, or a little bit less,—about the same force as a half-dollar set upon a table and allowed to turn over."

There is nothing in the evidence to justify the conclusion that the operator wilfully refused to respond to the plaintiff's signal. She testified, and her testimony is undisputed, that she gave the plaintiff a connection about two o'clock; that about five o'clock she was awakened by a night signal on another "position," and then

for the first time discovered that the plaintiff had been calling; that she did nothing to put the night circuit out of order and did not know when it got out of order; and that she answered her night calls as usual. The company was bound only to ordinary diligence. The only evidence of a failure to exercise this degree of care is the fact that the night circuit got out of order and the bell failed to ring. The burden was on the plaintiff to prove his allegations of negligence. It appears, from the testimony, that the failure of the gong or bell to ring was due to the fact that the "night-bell contacts" were slightly bent, so slightly as not to be observed except upon a close inspection. The mechanism was inspected at six o'clock and found to be in good working order. Just what force bent the night contact does not appear. According to the evidence, the mechanism was delicate, and human ingenuity has been unable to attain absolute perfection or to construct a device for night service which will never get out of order. Ordinary care did not require the defendant to keep the operator on duty all night at an exchange where there was only a small demand for service during the latter part of the night. The operator was up at two o'clock. The company had in use the best contrivance human experience and ingenuity had been able to discover. It was inspected and found to be working properly. It got out of order from some unknown and unforeseen cause. The mere fact that it was out of order did not of itself alone prove negligence.

Telephone subscribers take the risk of a failure to obtain connection due to any disarrangement or disturbance of the mechanism, not caused by negligence on the part of the telephone company. In other words, if the company furnishes facilities equal to those in general use, and uses ordinary care to keep them in proper working order and to furnish the subscriber the service for which he has contracted, he can not hold the company responsible for the failure to make prompt connection in a given instance. The evidence discloses (and it is a matter of common knowledge) that frequently a subscriber can not obtain a connection, and the cause of the trouble is not discovered until after a most minute inspection. Generally the fact that trouble exists is not discovered until a connection is sought and not obtained. To hold these companies responsible for the consequences ensuing from a failure to make a connection, because an inspection afterwards made shows that some

part of the mechanism was out of order, would be equivalent to making them insure a connection whenever called for, and render them liable for any damage which may result from the failure to furnish promptly the service called for. This would be holding them to the very highest possible degree of diligence; whereas they are, under the law, bound only to exercise ordinary care. The time may come when the instrumentalities may be so perfected that a higher degree of care should be imposed upon those undertaking to furnish telephone service; but that time has not yet arrived. Questions of negligence are generally for the jury, but where, as in this case, there is no evidence of negligence, a verdict finding that there was negligence is contrary to law and should be set aside.

The plaintiff contends, however, that the evidence authorized the jury to find either that the operator saw the shutter or drop in a condition which would indicate that the plaintiff was signalling, or that she was lacking in ordinary diligence in failing to see the signal or hear the noise made by the drop of the disk. The operator testifies positively that she did not see the shutter down and did not hear the noise made by the drop of the disk; and there was not a particle of evidence to justify the inference that she was telling an untruth. The presumption is that if she had known the plaintiff was signalling, she would have responded. There is nothing in the evidence to suggest any reason why she should not have done so. She appears to have been a faithful and competent employee, diligent and attentive to her duties, and there is nothing to warrant the conclusion that she wilfully and wantonly refused to give the plaintiff the connection which he desired. The plaintiff testified that he signalled the operator about 10 or 15 seconds after he had finished his conversation with the doctor and hung up the receiver. He said, however, that the telephone was in the hall, on the facing of the door that entered his wife's room; that he hung up the receiver, walked 10 or 12 feet to the foot of his wife's bed, stopped long enough to see that she was in labor, then walked back to the telephone and signalled the operator. The operator testified that after the plaintiff had finished the conversation with the doctor, she disconnected them and retired, "as soon as the connection was completed and the call taken down, and left the room as soon as I could walk from one room into the other,—about

a minute, I suppose." The evidence shows that the room in which the operator retired was located just west of the switch-board, about ten or twelve feet away.

Counsel for the plaintiff contended that, as the plaintiff said the time which elapsed between the end of his conversation and the effort to signal the operator was but ten or fifteen seconds, and as the operator admitted that she remained in the room a minute after the conversation ended, the jury were authorized to find either that she wilfully refused to give the connection or else that she negligently failed to see or hear the plaintiff's signal. Neither the plaintiff nor the operator made an exact computation of time. It is manifest that both were giving merely an estimate of the time which elapsed between the two occurrences to which they referred. The physical facts show that the time probably required was about the same in each instance. The plaintiff was obliged to hang up the receiver, walk ten or twelve feet to his wife's bedside, remain long enough to see that she was in labor, return the same distance to the telephone, and take down the receiver and signal the operator. He says positively this required not more than ten or fifteen seconds. Without using the technical terms referred to in the evidence, it is perfectly plain that all that the operator was required to do could have been done in at least as short a time and probably in less time than was required for the plaintiff to do what he says he did. At any rate, the operator says positively and unequivocally that she immediately left the switch-board after the conversation ended and retired to her room, some ten or twelve feet away; that she did not see or hear the plaintiff's signal, and that she did not know that he had signalled until 5:20 the next morning. She had no reason to anticipate that the plaintiff would call again. Ordinary care did not require her to remain at the switch-board. She had the right to rely upon the fact that the night-gong was in good order, and that by this means she would be advised of any call made by a subscriber. There is nothing in the evidence to justify the conclusion either that the operator wantonly refused to recognize the plaintiff's signal, or that she was lacking in ordinary care in failing to observe it.

For these reasons we are clear that the verdict was not authorized by the evidence and that a new trial should have been granted.

*Judgment reversed.*