21693. GEORGIA RAILROAD AND BANKING CO. *v.* FARMER *et al.*

131

Decided April 29, 1932.

*McDaniel, Neely & Marshall,* for plaintiff in error.
*Branch & Howard,* contra.

Luke, J. J. R. Farmer proceeding in his own behalf, and his minor children, Martha, Eugene, Helen, and Lois Farmer, suing by him as next friend, brought an action against Georgia Railroad and Banking Company to recover damages for the alleged negligent homicide of Mrs. Delma Farmer, his wife and their mother. A jury rendered a verdict for plaintiffs in the sum of $15,000. The question presented here is whether the trial judge erred in overruling the defendant's motion for a new trial.

Omitting some of its formal allegations, the petition, by paragraph, presents substantially the following case:

4. Mrs. Delma Farmer was killed at McDaniel's Crossing on May 23, 1930.

5. The homicide was the result of defendant's negligence.

6. Said crossing is a public crossing over defendant's railroad-tracks, and is located some two miles or more west of Conyers in Rockdale county.

7. "One of the public highways of said county crosses the defendant's railroad tracks at McDaniel's Crossing, the said public highway being the old highway running from Conyers to Lithonia, and another public highway . . intersects the first named highway at said McDaniel's Crossing, said . . crossing being used as the crossing for both of said public highways. The highway which intersects the first mentioned highway approaches said crossing from a northwesterly direction, while the other highway . . approaches from a northeasterly direction."

8. "On . . May 23, 1930, and for some time prior thereto, the said crossing . . was in an extremely rough and dangerous condition. The surface of the highway crossing between the rails of the defendant's track and for eight or ten feet on each side thereof, was very rough, having holes and sunken places therein, and, especially at the west end of said crossing, said crossing was very rough and dangerous by reason of the fact that the defendant's rails projected for some four or five inches above the surface of the highway, rendering the said crossing extremely rough and dangerous, and especially for automobiles crossing the same."

9. "Approaching said crossing from the north side of the defendant's tracks, for the distance of ten or twelve feet before reaching . . defendant's tracks, there was a very sharp and sudden ascent . . ."

10. Defendant had neglected to comply with the law requiring it to keep said crossing in good order, and had permitted it to remain in said rough and unsafe condition for six months prior to said homicide.

11. On the evening of May 23, 1930, between 7 and 7:30 o'clock, Mrs. Delma Farmer and the Farmer children hereinbefore named, traveling in an old-style Ford touring car, approached said crossing "upon the highway leading to said crossing from the northwest, . . and when said automobile reached said crossing and got upon said crossing the engine, or motor, of the automobile 'went dead' because of the fact of the rough and unsafe condition of said crossing. . ."

12. "As said automobile approached and entered upon said cross-

ing there was no train in sight, but before the motor could be started or the automobile removed from said crossing, a train, operated upon said tracks and coming in an easterly direction, . . approached the crossing . . at the rate of from fifty to sixty miles an hour."

13. "When the said Mrs. Farmer discovered that said train was rapidly approaching said crossing . . she attempted to leave said automobile and to remove herself and said children from the path of said train, . . but while she was in the act of so doing she was caught by the rapidly moving train upon said crossing, and was struck with terrific force by the engine of said train and hurled a distance of some thirty or forty feet, and was instantly killed."

14. Said crossing was a flag-stop, and was much used by the public.

15. As said train was approaching said crossing it was being operated at said high rate of speed, and the engineer and fireman on said train were not keeping a lookout ahead along said track, "and failed to observe the requirements of the law that while approaching and passing a public crossing the engineer shall keep and maintain a constant and vigilant lookout along the track ahead of said engine in order to avoid any injury to any person or property which might be upon such crossing or upon the line of said railway at any point within fifty feet of such crossing."

16. Said engineer and fireman "did not keep a constant and vigilant lookout as the said engine approached said crossing, . . and failed to discover the presence of the said automobile and of the said Mrs. Farmer and her children upon said crossing, which they could have done had they observed the requirements of the law requiring the keeping of a constant and vigilant lookout as the train approaches a crossing."

17. Said train approached said crossing without any vigilant lookout being kept ahead and without the speed of the train being checked, and struck Mrs. Farmer and also the automobile, completely wrecking the automobile, and "continued at said rapid rate of speed . . even after striking and killing Mrs. Farmer and demolishing the automobile."

18. "Said defendant was especially negligent in the operation of said train, . . that is, without any vigilant lookout being kept ahead, because of the character of said crossing, . . and espe-

cially by reason of the fact that said place was not only a public crossing but was a flag-stop, . . and was a place which was much used and frequented by the public."

19. After the defendant's negligence became known to Mrs. Farmer, "she could not, by the exercise of ordinary care, avoid the consequences of the defendant's negligence, and she could not, by the exercise of ordinary care on her part, have discovered said negligence of said defendant in time to have avoided the consequences thereof."

20. Mrs. Farmer's death "resulted from the negligence and illegal acts of the defendant as hereinbefore set forth."

21. Mrs. Farmer was thirty-seven years old and in good health, "and, in addition to performing the duties of a wife and mother and housekeeper, . . she aided her husband in the operation of his farm, frequently attending to practically all of the duties of superintending the operation of the farm, due to the fact that her husband was in poor health . . and the services which she rendered . . were reasonably worth $2,500 to $3,000 a year."

In paragraph 2 of the petition it was alleged that the defendant damaged petitioners in the sum of $50,000.

By an amendment to the petition, plaintiffs pleaded that "defendant was negligent in that the defendant's engineer did not comply with the requirements of the act approved August 19, 1918 (Acts 1918, p. 212), in that he failed to give the signal and maintain the constant lookout as required by said act. . ."

The effect of defendant's answer was to deny jurisdiction and damages as alleged, to admit paragraphs 6 and 7 of the petition, and to put plaintiffs upon proof of the other material allegations of the petition. In answering paragraph 13 of the petition, defendant averred that "Mrs. Farmer left the automobile and was in a place of safety, and without cause returned towards the automobile . . after having gotten into a place of safety."

"14. For further answer . . defendant avers that the sole proximate cause of the death of Mrs. Farmer was her own negligence, and avers that the car was being driven by a boy eleven years old who was at the time the son and agent of the decedent, and who is one of the petitioners in this case, in violation of the law which provides that persons under sixteen years old shall not be permitted to operate automobiles. . . It avers that the stalling of

the car upon the track . . was in no sense the result of the condition of the crossing, but was through the negligence of the said chauffeur in failing to give the same sufficient gas to move the same over the tracks; that after said car became stalled, the signal bell on the crossing was ringing and all of the occupants of the car were clear of the same, and, for some reason unknown to defendant, Mrs. Farmer returned in the path of the engine as it approached the automobile and was killed.

"15. Defendant avers that at the time the agents and servants of the defendant were keeping a constant and vigilant lookout ahead. It was dark and, if there were lights on the automobile, same were turned away from the direction in which the engine was approaching. There is a curve approaching the said crossing which cut off the view of the engineer therefrom, and, by reason of the darkness and the curve, the fireman could not have discovered the presence of the automobile or the presence of Mrs. Farmer upon the track in time to have prevented striking either Mrs. Farmer or the automobile."

"16. Defendant avers that if Mrs. Farmer had remained as she was in a place of safety removed from the track, she could not have been injured, and the proximate cause of her death was her returning to the track after having been in a place of safety."

We quote from Martha Farmer's testimony as follows: "I am fourteen years old. . . We had to cross the railroad on our way home. . . There was in the car my brother Eugene, and my two little sisters, Helen and Lois, and my mother and myself. I was the oldest child. . . I was riding on the right-hand side of the front seat. My mother was sitting between me and my brother Eugene. Eugene was driving the car. When we got to McDaniel's Crossing we stopped. We did not see the train. The bell was not ringing. When we started to cross, the car wheels hit the rail and stopped. Eugene tried to start it. The first thing we knew of it, a negro came and told us that the train was coming; and he helped them out, and I got out. No, there was not any bell ringing when we got to the crossing. . . There was a steep grade to the crossing. . . When we got on the crossing the car hit the rail and it stopped the motor. . . When the motor went dead, I did not see any train coming or hear any bell. I did not hear anything. . . The lights were burning on the car. Eugene tried to start the

motor with the self-starter. He was trying to start it when the negro came up and said the train was coming. When he said that, I got out of the car on the right, and mamma got out; and mother said: 'Where is Lois?' . . She never had left the car., She was standing right at the corner of the fender, and she said: 'Where is Lois?' As to where I was then, I was right out there in the road about five or six steps from the car. . . My mother never got off the track. When the train hit my mother she was standing at the right-hand fender—the right-hand back fender. She had never left the track. . . When I next saw her, she was further up the railroad near the track. She was lying down. She was cut up so you could not tell much about her. . . The train did not stop there. . . It did not slow down any. There are four children in our family. . . The youngest one is named Lois. She is six years old."

On cross-examination, Martha Farmer testified, in effect, that the rear of said automobile was towards the approaching train—that "the car was kind of catercornered on the track," and Gene tried to start the motor with the self-starter and rolled down towards Conyers. This witness also testified, on cross-examination: "My mother did not get away from the track and come back to the track after Lois. She never left the track—never got off the track at all . . My mother walked from where she got out to about the rear fender. As to whether that is as far as she got, then she kind of tarried and said: 'Where is Lois?' about the time the train hit her. She had never left the track. . . She knew the train was coming, but didn't know that Lois was out of the car. She was hurrying to get away. . . We all knew the train was coming as soon as the negro came up and told us. . . We had not heard it blow before that. . . We had not heard any bell ring. . . I did not hear it blow for the station. I did not hear any blow signal. As to whether we saw the headlight, we were not facing towards the headlight. . . We had not seen the reflection of it. . . We were up on the track about three or four minutes, I think. . . While we were on the track Gene was trying to get the car started. . . We did not hear the train . . blow for that crossing. . . I know Mr. Davis, the railroad claim agent. He . . got a statement from me and my brother. . . This is my signature to this statement. . . He asked me questions

and I told him, and he put it in his own words. . . He had my father to witness this paper. . . I said: 'I am sure mamma followed me when I got out, and went the same way I did.' . . I am sure of that; she followed me and went the same way I did. . . She did not have time to get any further than the back of the automobile. I am sure she did not. . . I heard her say: 'Where is Lois?' and I got five or six steps away, and she got hit. . ."

Eugene Farmer, the driver of the automobile, testified: that he was eleven years old when his mother was killed; that when he reached McDaniel's Crossing, he "stopped and went into low gear;" that the wheels struck the rail and killed the engine; that he did not know that the train was coming until a negro ran up and told him so; that the negro helped him and Lois and "the other little girl out;" that he did not see his mother get out of the car, and did not see her after that; that the automobile lights were on; that his mother kept house, and cooked, and hoed and picked cotton— that his father was sick and his mother looked after the farm; that witness made a statement to Mr. Davis, and signed the statement presented to him; that the car rolled down towards Conyers a foot or two, leaving the rear of the car towards Atlanta—"kind of cater-cornered back up towards the way the car was coming;" that no signal bell rang, and he heard no whistle; that he thought the car was on the track "about three or four minutes;" that his mother said to go on, it would not be long before train time; that he and Lois and "the other little girl got out" and were about seventy-five feet away when the train struck the automobile; that he had been driving an automobile since he was six years old; that he had driven "over that crossing a good many times" and the car had choked down there before; that it was right steep and he "had to get in low;" that the rails were a little above the ground; and that the engine was not far from the car when the negro said the train was coming.

J. R. Farmer testified, in part, that there was blood from where the automobile was struck to where it was lying some seventy-five feet below the crossing; that the crossing was on a public road; that the rails on the crossing were above the surface of the ground and "it was not filled in enough between the rails;" that his son, Eugene, had been driving the car for a long time, and knew how to

operate it; and that his wife was in good health. In regard to his wife's services, Farmer testified: "My wife was thirty-seven years old. Her health was good, . . she did house work and looked after the children, and looked after the farm when I was not able to get out. My wife looked after the farm about three fourths of the time, because I was not able to do it. . . My wife did the cooking and the housekeeping, cleaning the rooms and making up the beds, and all such as that. . . We had three children at school. When I was sick my wife nursed me and gave me my medicine. . . That was the case for a month at a time when I could not get out. I had asthma. . . My wife looked after the farm, she went to the field and worked, and looked after the hands. She did some of the work in the field, and she hired hands to do some of it, and she did the house work and the farm work, and she looked after the children, and such as that. As to what it would cost to have that done, I just don't know exactly. I don't suppose you could get it done for less than $75 or $100 a month. Yes, I hired nurses. They cost about $40 a week."

J. O. McWilliams testified: "The condition of the crossing was bad. There was not enough dirt between the cross-ties—not enough dirt between the rails on the crossing. A car would sometimes stall on the crossing. . . Looking towards Atlanta from the crossing you could see the headlight of an engine a right good piece, but the headlight would not show on the track, on account of the crossing. . ."

H. J. Britt testified, in part, as follows: "As to the condition of those rails on the crossing—the rails projected above the dirt. It was not filled in enough between the crossties or between the rails. The rails were exposed above the crossties about three inches. . . You might burst a casing on the crossing—you had to cross easy. . . I have seen little Gene . . frequently driving the car. I did not see anything wrong with his driving, nothing whatever."

Charles Nix testified that Gene was a careful and efficient automobile driver.

B. H. Morris, who was driving the engine that killed Mrs. Farmer, testified: that he did not know that the accident had happened until he reached Social Circle; that he did not know the condition of the crossing; that his engine approached the crossing at a speed of

about forty miles an hour; that he was looking out, but that the light from the engine did not shine upon the crossing because of a curve in the track; that only he and his fireman, Mr. Marvin Seals, were on the engine; that he gave the whistle signal and rang the bell; that he started blowing the "whistle signal" at the whistle-post and stopped blowing about twenty-five or thirty feet before reaching the crossing; that a person standing on the crossing could see the headlight of the engine "a half mile;" and that it was a dark, cloudy night.

M. Seals testified: that he was fireman on the engine in question; that the engineer could not see the crossing because of the curve in the track; that the crossing was a flag-stop, and witness looked out to see if there was any one there to get on the train, but saw no one; that he saw no light on the crossing; that he heard no noise when the engine hit the car; that the engine did not slack up for the crossing. This witness further swore: "It was my duty to keep a lookout for the crossing. . . There was every reason to look out for the crossing. . . I started looking out when I was several hundred yards away, and kept looking until I was in a hundred yards of the crossing, I suppose. . . As to whether I can remember what happened or what I did after I stopped looking out, I had several other duties to perform. I don't know exactly when the engine passed there. . . I saw the wrecked automobile the next day; . . the right rear wheel was broken."

J. V. Jones testified, in part, as follows: "I was conductor on the accommodation train the night Mrs. Farmer got killed. . . We were going about forty miles an hour. . . Mr. Morris blew for crossings, . . but I did not notice about McDaniel's Crossing. . . It was almost dark when we reached that crossing, but it was not full dark, it was between sundown and dark. . ."

Luther Smith, sworn for the defendant, testified, in part, that he came upon the scene of the tragedy when the automobile was stalled on the crossing, and Eugene was trying to start the car with the self-starter; that witness tried to push the car off the track, but could not do so, because the wheels of the car were against the rail; that as witness was pushing the car, the crossing bell rang; that the children got out of the car, but that they did not get far from the track before the collision; that witness "did not see what became of the lady;" that the crossing bell continued to ring while he was

getting the children away, and that the bell was all that he heard; that he did not see Mrs. Farmer get out of the car; that he "had not been there but a few seconds when the thing happened;" and that he helped the little boy out of the car.

R. L. Hudson, sworn for the defendant, testified, in part, that the train blew for McDaniel's Crossing, and that the lights of the engine were burning; that "for some reason they [cars] stall on the crossing more or less; that the collision made a loud crash; and that the engine stopped blowing about two hundred yards above the crossing. Jeff Hudson testified substantially as did R. L. Hudson, especially as to the engine's stopping blowing two hundred yards above the crossing. J. G. Mann, swore for the defendant, testified that he heard the train blow, saw the headlights burning on the engine, saw the lights on the automobile, and saw the automobile lights "headed straight across the crossing." L. G. Pippen, sworn for the defendant, testified, that he repaired McDaniel's Crossing Monday or Tuesday before the accident, and that it was "in good shape," and he imagined that the rails "extended above the dirt about an inch or an inch and a half."

We quote from the signed, unsworn statement of Martha Farmer as follows: "While Eugene was trying to get the motor started, a negro man came to the car on the left-hand side and said, 'Get out quick.' Mamma and I got out on the right-hand side of the car. I got out first and mamma got out after I did. . . I got out and went back the way we came from. I am sure mamma followed me when I got out, and went the way I did. I heard her say: 'Where is Lois?' and I saw her going back towards the car. . . Just at this time, I saw the train for the first time very near the crossing. Mamma started back towards where I was, and just as she reached the rear corner of the automobile the train hit her and the automobile. . ."

We quote briefly from the signed statement of Eugene Farmer as follows: "I am eleven years of age. . . On Friday, May 23, 1930, my mother and three sisters, Martha Farmer, age thirteen years, Helen, age nine years, and Lois, age six years, went to Conyers to do some shopping. . . As I drove up on the Georgia Railroad at McDaniel's Crossing, there is a curve in the dirt road to the right. . . The road at this point is steep. As the automobile wheels struck the rail on the far side of the railroad and

the rear wheels struck the left-hand or near rail, . . the motor stopped. . . I tried to start the motor with the self-starter, and it failed to fire. The starter was working, but the motor did not fire. . . I cut my wheels to the left to see if the car would roll down grade, and it did roll a foot and a half or two feet until the wheels hit the rails. At this time a negro man came up to the car on the left-hand side and caught me with one hand and Helen and Lois with the other hand and pulled us out of the car. About this time, mamma and Martha got out of the car on the right side. . . I think the train struck the right rear wheel of the car. . ."

Mrs. R. L. Hudson's testimony adds little or nothing to that already given. However, she did testify, upon cross-examination, as follows: "It [McDaniel's] is a dangerous crossing. Cars often stall on that crossing. . . I suppose it is because the rails stick up so far above the ground. . . When they would hit those rails sticking above the ground, that would choke the car down. The crossing was in very bad shape. Everybody was complaining of it . . We had often noticed cars there after a rain. . . I have seen a few just barely get off. . ." Dr. Frank McDaniel, sworn for the plaintiff, testified, in part: "Coming up that little slant to the crossing, the rails of the track were standing up pretty high to where it was difficult to get across there. The rails were sticking up so high that it stalled my car. I have crossed there some two or three times when it would stall my car in second gear. . . I have had eighteen years experience in driving a car." W. R. Still, with reference to the condition of the crossing, testified: "The track on the west side was nearly clear of any dirt between the rails. . . I mean that the rails were above the surface of the dirt almost the entire length of the rails. . . That made it difficult to get over there; it would affect any vehicle." Referring to said crossing, H. T. Edwards testified that "the bottom of the rails were about even with the top of the ground. . ."

We have not set out the testimony of all the witnesses, and have not given all the testimony of any witness. We have studied the voluminous record carefully, however, and are satisfied from it that the verdict is supported by the evidence, and that the trial judge did not err in overruling the general grounds of the motion for a new trial.

Special ground 1 complains that the verdict of $15,000 is ex-

cessive. This contention is based largely upon the theory that J. R. Farmer testified that his wife's services were worth from $75 to $100 per month, and that, taking the larger of these sums, the value of her life, measured in accordance with the annuity and expectancy tables, would only be $13,348.80. It is also insisted that no deduction was made in the verdict for the negligence of the decedent. With this exception in view, we have set out rather fully the testimony of J. R. Farmer in regard to his wife's services, under the part of this opinion dealing with the general grounds. It may not be amiss to state here that Mr. Farmer's testimony was supported by that of Martha and Eugene Farmer. "Where the age of a person is shown, his expectancy of life may be determined by the jury without any other direct evidence on the subject. Tables of the probable length of life and its probable worth may be useful, but are not conclusive or absolutely essential for that purpose. Upon proof as to a person's age, health, and earning capacity, the jury may estimate the value of his life, and reduce that value to its present cash value, by any method satisfactory to them which produces a definite result that is fair and reasonable and is authorized by the evidence." *Standard Oil Co.* v. *Reagan,* 15 *Ga. App.* 571 (5) (84 S. E. 69). Headnote 6 of the same decision reads: "When the jury disregard instructions from the court as to a method of calculation, and by some other method reach a result which is fairly deducible from the evidence, but different from what they might have reached by adopting the method suggested by the court, the verdict may nevertheless be sustained. It is immaterial how a result be reached, so that it is legal, just, and accurate." Headnote 7 of the same decision reads: "The jury may increase damages awarded for death caused by wrongful act, by including, in the total sum awarded, legal interest, from the time of the death to the date of the verdict, on the cash value of the life of the deceased at the time of death."

We quote next headnote 9 of the same decision: "In estimating the value of ordinary domestic service rendered by a wife, the jury are authorized to take into consideration what may be the value of many services incapable of exact proof, but measured in the light of their own observation and experience. 'Some wives perform manual labor—others do not; yet the husbands of the latter no less than those of the former would certainly be entitled to com-

pensation from wrong-doers for causing inability to perform service.
. . There need be no direct or express evidence of the value of
the wife's services, either by the day, week, month, or any other
period of time, or of any aggregate sum.' *Metropolitan St. R. Co.*
v. *Johnson,* 91 *Ga.* 466, 471, 472 (18 S. E. 816)."

Without further citation of authority, we hold that the ground
complaining that the verdict is excessive is without merit.

■ The court did not err in failing, without request, to define
"negligence" and "ordinary care," and there is no merit in special
ground 2. *Savannah Electric Co.* v. *Bennett,* 130 *Ga.* 597 (61 S.
E. 529); *Western Union Telegraph Co.* v. *Ford,* 10 *Ga. App.* 606
(5) (74 S. E. 70); *Wakefield* v. *Lee,* 18 *Ga. App.* 648 (4) (90 S.
E. 224).

■ Special ground 3 complains that the court, without request,
failed to charge section 2781 of the Civil Code (1910), which reads
as follows: "No person shall recover damage from a railroad com-
pany for injury to himself or his property, where the same is done
by his consent, or is caused by his own negligence. If the com-
plainant and the agents of the company are both at fault, the former
may recover, but the damages shall be diminished by the jury in
proportion to the amount of default attributable to him." The
defendant's answer made the contention that the deceased's "active
negligence" was the proximate cause of her death; for it substan-
tially alleged that Mrs. Farmer left the automobile and reached a
place of safety, and then, "without cause," returned to the rail-
road-track; but we are by no means sure that this averment is sup-
ported by valid evidence. Martha Farmer, the oldest child in the
automobile, testified most insistently that her mother never left the
railroad-track, and she was the only witness who pretended to know
of the conduct of her mother upon the occasion in question. In-
deed, her unsworn statement does not necessarily conflict with her
testimony in this regard; and, so far as that statement is concerned,
we do not understand that it could have had any other function in
the case than to contradict Martha. "The failure to give instruc-
tions to the jury not demanded by the evidence will, in the absence
of a written request to so charge, in no event be cause for a new
trial." See *Atlanta & West Point R. Co.* v. *Smith,* 38 *Ga. App.* 20
(3), 22 (142 S. E. 308), and citations. See also *Savannah Elec-
tric Co.* v. *Fosterling,* 16 *Ga. App.* 196 (84 S. E. 976); *Bateman* v.
*Cherokee Fertilizer Co.,* 21 *Ga. App.* 158 (93 S. E. 1021).

Furthermore, the court did charge as follows: "In order for the plaintiffs to recover, it must appear, by a preponderance of the evidence, that the defendant was negligent in some one or more of the respects alleged in the petition, and that the death of Mrs. Farmer resulted from such negligence. And it must further appear that the deceased could not by the exercise of ordinary care have avoided the consequences of the defendant's negligence, if the defendant was negligent." The court also charged the jury fully upon comparative negligence.

In the case of *Seaboard Air-Line Ry.* v. *Andrews,* 140 *Ga.* 254 (4), 258, 259 (78 S. E. 925, Ann. Cas. 1914D, 165), where the charge of the court was substantially the same as that quoted above, the court held that the charge substantially covered the applicable part of section 2781 of the Civil Code, supra, and that "if further instructions on that point had been desired, an appropriate written request should have been made." We hold that ground 3 discloses no reversible error.

■ Special ground 4 complains that the judge failed to charge the jury "with respect to any negligence on the part of the plaintiffs themselves, or the effect of the negligence on the part of the plaintiffs, or any one of them, upon their right to recover against the defendant;" and especially that he failed to charge upon the effect of negligence on the part of Eugene and Martha Farmer. The court charged the material issues in the case, and if any other or further charge was desired along the lines indicated in this ground, it should have been requested in writing. We hold that the trial judge did not commit reversible error for any reason suggested in special ground 4.

■ Ground 5 complains that after charging that "A husband may recover for the homicide of his wife, and if she leaves a child or children surviving, said husband and children shall sue jointly and not separately, with the right to recover the full value of the life of the deceased, as shown by the evidence," the court further charged as follows: "The word 'homicide,' used in the preceding section, shall be held to include all cases where the death of a human being results from a crime, or from criminal or other negligence." The contention in this ground is expressed in this language: "Movant contends that the said charge was inapt and was calculated to mislead the jury into the belief that the defendant company, its

agents and servants, were guilty of criminal negligence. . ."
The court's definition of "homicide" is taken directly from the
Civil Code (1910), § 4425, and we see no error in the court's giv-
ing this definition in the language of the code section.

■ In ground 6 exception is taken to the following portion of
the court's charge: (a) "In order for the plaintiffs to recover,
it must appear, by the preponderance of the evidence, that the de-
fendant was negligent in some one or more of the respects alleged
in the petition, and that the death of Mrs. Farmer resulted from
such negligence, and it must further appear that the decedent could
not, by the exercise of ordinary care, have avoided the consequences
of defendant's negligence, if the defendant was negligent." (b)
"I further charge you that the duty imposed by law upon a person
to avoid the consequences of another's negligence does not arise
until the negligence of such other is existing and is apparent, or the
circumstances are such that an ordinarily prudent person would
have reason to apprehend its existence or could, by the exercise of
ordinary care, have discovered or known of its existence. Failure
of a person who is injured to exercise ordinary care before the
negligence complained of is apparent or should have been reason-
ably apprehended will not preclude a recovery, but will authorize
the jury to diminish the damages in proportion to the fault at-
tributed to the injured person." It is contended that the first
sentence of that part of the charge designated by us for conven-
ience as "(b)" "is in direct contradiction of the latter portion of
the charge;" that is to say, the last sentence of "(b)." Again, it
is insisted that the last sentence of "(b)" "is in and of itself
erroneous," and that the effect of it would be "to preclude a recov-
ery, and not to diminish the damages in proportion to the fault
attributable to the injured person." It is also urged that the court
erred in failing "to charge, in connection with the charge quoted
. . or elsewhere, . . the provision of law contained in sec-
tion 2781 of the Code, to the effect that no person shall recover
damages from a railroad company for an injury where the same is
done by his consent or is caused by his own negligence."

The charge complained of appears to be in line with the law
laid down in *W. & A. R. Co.* v. *Ferguson*, 113 *Ga.* 708 (39 S. E.
306, 54 L. R. A. 802), and followed in numerous other cases. See
*A., K. and N. Ry. Co.* v. *Gardner*, 122 *Ga.* 82 (3), 87 (49 S. E.

818); *Wrightsville & Tennille R. Co. v. Gornto,* 129 *Ga.* 204 (4) (58 S. E. 769). We hold that the court did not commit reversible error for any reason assigned in ground 6.

■ It appears from ground 7 that after the judge had charged section 2780 of the Civil Code (1910), counsel for the plaintiff suggested to him that said section had been declared unconstitutional, and thereupon the court specifically and clearly withdrew that portion of his charge from the jury. It further appears, from that ground, that, after the jury had retired, the court had them to return to the court-room and instructed them as follows: "I inadvertently read to you this section of the code [quoting said section] . . I want to withdraw it. The United States Supreme Court has decided that this is not good law. I did not know of it, or overlooked it, and I want to withdraw what I have just read to you. You will not consider it at all in making your verdict." It is insisted that in employing the phrase, "the United States Supreme Court has decided that this is not good law," the court "indicated to the jury inferentially that the presiding judge did not agree with the United States Supreme Court," but that, "having overlooked the decision of the Supreme Court of the United States, he felt it incumbent upon him to withdraw that portion of the charge." The foregoing criticism of the court's conduct and charge is obviously without merit, and does not warrant further comment. It is further urged in this ground that the judge erred in that, after withdrawing said charge from the jury, he failed to "charge the true law with respect to the duty of the defendant to the plaintiff . . as movant contends was contained in the act of 1929, . . as follows: that 'in all actions against railroad companies for damages done to persons or property, proof of injury inflicted by the running of locomotives or cars of such company shall be prima facie evidence of the want of reasonable skill and care on the part of the servants of the company in reference to such injury'." There was no request for such a charge, and how the defendant could have been injured by the failure of the court to charge as indicated we are at a loss to understand. We hold that there is no merit in the ground.

■ Ground 8 avers that the court erred in charging the jury as follows: "If you find that the deceased and the defendant were both negligent, and the negligence of the deceased was equal to or greater

than that of the defendant, the plaintiff would not be entitled to recover. If you should find that both the deceased and the defendant were negligent, but that the negligence of the defendant was greater than that of the deceased, then the plaintiff would be entitled to recover, if otherwise entitled to recover under the rules I have given you, but in such event you would reduce the amount of the recovery in proportion to the negligence of the deceased, if she was guilty of such negligence." The main contentions of plaintiff in error in regard to this charge are expressed in the brief filed by its counsel, in this language: "In other words, the court in this charge authorizes a recovery of diminished damages if the jury finds that the negligence of the defendant railway company was greater than that of deceased, irrespective of the decedent's negligence, as expressed in section 2781 of the Code, and irrespective of her ability to avoid the consequences of the defendant's negligence." In short, error is alleged because the court did not charge the principles of law contained in sections 2781 and 4426 of the Civil Code (1910), in connection with the quoted excerpt. The first sentence of section 2781 reads: "No person shall recover damage from a railroad company for injury to himself or his property, where the same is done by his consent, or is caused by his own negligence." Section 4426 reads: "If the plaintiff by ordinary care could have avoided the consequences to himself caused by the defendant's negligence, he is not entitled to recover. But in other cases the defendant is not relieved, although the plaintiff may in some way have contributed to the injury sustained." In another part of his instructions the judge did charge section 4426. The court also instructed the jury that in order for the plaintiffs to recover, "it must further appear that the deceased could not by the exercise of ordinary care have avoided the consequences of the defendant's negligence." See *Davis* v. *Whitcomb,* 30 *Ga. App.* 497 (15) (118 S. E. 488), where a charge substantially the same as the one here criticised is involved, and where the court held there was no error. See also *Southern Ry. Co.* v. *Reed,* 40 *Ga. App.* 332 (3), (4), (5), and (6) (149 S. E. 582). We do not think it can be said with fairness that the excerpt criticised in this ground was subject to the criticism that under it diminished damages could be recovered even though the deceased consented to the homicide or caused it by her own negligence.

It is further contended in this ground that "said charge was error

for that the court failed to instruct the jury in connection with respect to any negligence which might have existed on the part of the . . plaintiffs who were accompanying the decedent in the automobile prior to its stalling upon the tracks, or any negligence on the part of the plaintiffs, beneficiaries, who, with their mother, remained on the track after knowledge that the train was due or after knowledge that the train was approaching." To our minds, the criticism itself is somewhat indefinite as to just what charge was desired, or what particular instructions were omitted. A request in writing would, no doubt, have apprised the court of the principle of law invoked, and we think such a request should have been made.

In concluding our discussion of this ground, we will state that the charge criticised appears to have been inherently correct, and that there was no request for any other or further charge, and that for no reason urged does the ground disclose reversible error.

Grounds 9, 10, and 11 will be considered together. The first complains that Martha Farmer was permitted to testify: "My father is not in good health." The second avers error because Eugene Farmer was allowed to swear: "My father was sick at times. He did have spells of sickness and was not able to go out to work." The gist of the objection to the evidence set out in each of these grounds was that the measure of the recovery was "the value of the life of the deceased without deductions for personal expenses" and that evidence as to the condition of the health of J. R. Farmer was irrelevant and immaterial. Paragraph 21 of the petition avers that Mrs. Farmer "aided her husband in the operation of the farm, frequently attending to practically all of the duties of superintending the operation of the farm, *due to the fact that her said husband was in poor health and at times wholly unable to do any work or perform these duties. . ."* (Italics ours.) There was no demurrer in the case. It appears from the foregoing italicized portion of paragraph 21 of the petition that the poor health of Mr. Farmer was specifically pleaded. This is put in issue by the answer. In these circumstances, it appears that the evidence objected to was admissible. See *Fleming* v. *Roberts,* 114 *Ga.* 634 (3) (40 S. E. 792); *Kelly* v. *Strouse,* 116 *Ga.* 872 (43 S. E. 280); *Hill* v. *Wallace,* 31 *Ga. App.* 72 (119 S. E. 468).

In conclusion, we hold that for no reason assigned did the trial

judge commit reversible error in overruling the motion for a new trial.

*Judgment affirmed. Broyles, C. J., concurs. Bloodworth, J., absent on account of illness.*